IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

v.                                                      Criminal Action No. 3:20-cr-34

ANTHONY R. BUSTER,
              Defendant.

## OPINION

Anthony R. Buster has moved to suppress evidence and statements he made to police officers on the night of his arrest. Officers stopped and searched Buster because he matched the description of a suspect involved in a reported domestic assault incident. Buster made incriminating statements to the officers on the scene and later at the police station. He asks the Court to suppress the evidence the police uncovered during the stop and his subsequent statements, arguing that the officers lacked reasonable suspicion to stop him in the first instance. In the alternative, Buster asks the Court to suppress the statements he made to the interrogating officer at the police station because the officer initially failed to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Buster argues that the officer waited to give the proper warnings until after he admitted to criminal conduct and then elicited the same incriminating statements.

Because the officers had reasonable suspicion to stop and search Buster, the Court will deny the motion to suppress the gun and ammunition uncovered at the stop. The Court will also deny the motion to suppress Buster's statement at the scene because the statement falls within the public safety exception to *Miranda*. The Court, however, will suppress Buster's post-*Miranda* statements at the police station because the Court concludes that the interrogating officer undermined *Miranda* by engaging in an unlawful "two-step" questioning tactic.

## I. FACTS[1]

On September 22, 2019, at approximately 10:39 p.m., Officers Jaontay Wilson and Alexis Tyree-Williams of the Richmond Police Department responded to a reported domestic assault incident at the Creighton Court public housing community. (*See* Hr'g Tr. 6:25 to 7:9.)[2]  While the officers were walking toward the apartment in Creighton Court to which they were dispatched, Officer Wilson saw an African American man—later identified as Buster—quickly walk and then run away from the area.  Officer Wilson observed that the man was wearing black pants and a black shirt with "a lot of . . . speckles or colors." (*Id.* at 9:13-12:6.)  Officer Wilson told another officer to investigate the man, radioed to the other officers that the man was running toward 29th Street, and then continued to the apartment.

The officers met two women inside the apartment: the victim of the reported domestic assault incident and the witness who had called 911.  The witness, Leann Holman, had heard gunshots and yelling while speaking on the phone with the victim, Mone Anderson. (Gov't Ex. 2 10:41:45-10:41:48;[3] *see* Hr'g Tr. 69:3-15.)  At first, Holman thought that Anderson had been shot.  The officers eventually learned that Anderson's longtime boyfriend had pushed a car seat holding a baby, hit Anderson in the face, and reportedly shot a gun in the air when he left the apartment.  Holman said that Anderson's boyfriend was wearing an all-black shirt.

---

[1] The Court held an evidentiary hearing on the motion to suppress on June 29, 2020.  The Court draws the below facts from the evidence submitted at the evidentiary hearing, which included testimony from the officers and footage from the officers' body-worn cameras.

[2] Creighton Court is a high-crime area with frequent gun violence. (*See* Hr'g Tr. 92:12-22.)  The overwhelming majority of Creighton Court residents are African American.

[3] The time stamps reflected in the footage from the officers' body worn cameras are in "Zulu time," which is Greenwich Mean Time.  The Court has converted the time to Eastern Standard Time.

Officer Wilson then left the apartment to search for the man in question. Shortly after leaving the apartment, he saw a man near the Creighton Court basketball court putting down a bag and removing a black shirt. When Officer Wilson yelled "Hey!" the man ran away. (Gov't Ex. 1A 10:43:07-14; Hr'g Tr. 14:11-21.) Officer Wilson told other officers that the suspect had removed his shirt and was now wearing a white tank top. Around the same time—approximately 10:44 p.m.—Officer Wilson told officers over the radio that the suspect had fired a gun in the air. At 10:46 p.m., Officer Wilson radioed to other officers that the suspect was wearing a white tank top, blue jeans, and may have a black shirt and black bag with him.

Meanwhile, Officer Tyree-Williams continued to talk with Anderson, who was quite reluctant to give the police any information about her boyfriend. Anderson told Officer Tyree-Williams that she did not know whether her boyfriend had a gun. Although she heard "something" after her boyfriend left the apartment, she was not sure who had fired the gun because she often heard gunshots in the area. (Gov't Ex. 2A 10:43:38-10:43:57.) Anderson also told Officer Tyree-Williams that her boyfriend was wearing an all-black shirt with "speckley" pants or dark blue jeans. (Hr'g Tr. 98:6-10.) Anderson described her boyfriend as a dark-skinned man with hair in a "fro" style. (*Id.* at 106:6-7.) Officer Tyree-Williams did not relay that description over the radio.

At 10:56 p.m., Officer Tyree-Williams told Officer Wilson on the phone that the suspect was a dark-skinned man who had "hair" and was wearing an all-black shirt and "speckley" pants. (Hr'g Tr. 106:20-23; Gov't Ex. 2A 10:56:13-10:56:24.) Officer Wilson responded, "That's the wrong description." (Gov't Ex. 2A 10:56:22-10:56-25.) Officer Tyree-Williams also told Officer Wilson that the victim was unsure whether her boyfriend had a gun or if he shot it in the air when he left the apartment. Anderson did not describe her boyfriend's height, build, or age. She also refused to give her boyfriend's name to Officer Tyree-Williams.

3

Shortly after her phone call with Officer Wilson, Officer Tyree-Williams searched for Anderson in a police database. She found Buster's name from a prior shooting incident involving Anderson, which led Officer Wilson to believe that Buster might be Anderson's boyfriend. The officers, however, did not see a picture of Buster.

Eventually, the officers established a search perimeter around Creighton Court to try to box in the suspect. The officers gave up on their efforts between 11:10 p.m. and 11:17 p.m. Around the same time, Officer Wilson's supervisor, Sergeant John Bridges, noted that the officers had only "speculation" as to whether the suspect had a gun. (*Id.* at 63:5-64:6.)

Shortly thereafter, Sergeant Bridges radioed to Officer Wilson that a man wearing a white tank top was walking along Fairfield Avenue, which is several blocks from Creighton Court. Sergeant Bridges told Officer Wilson to investigate whether the man might be Anderson's boyfriend. Officers Wilson and Tyree-Williams then headed toward Fairfield Avenue. At approximately 11:18 p.m., Officers Wilson and Tyree-Williams spotted Buster as the man Sergeant Bridges saw on Fairfield Avenue. Buster was wearing dark jeans, a white tank top, a sheer head covering over his braided hair, a blue bandana around his neck, and a black fanny pack strapped across his back. He was not carrying a shirt. Officer Wilson testified that Buster's clothes, black bag, and "body structure" matched the man he saw running away. (*Id.* at 20:9 to 21:3.)

The officers neared Buster, parked, and left their police car. They called out to Buster and shined their flashlights toward him. Officer Wilson said, "Yo! Let me talk to you real quick," and motioned for Buster to come over. (Gov't Ex. 1B 11:18:35-11:18:37; Hr'g Tr. 73:5 to 74:10.) Buster said, "Nah," and continued walking. (Gov't Ex. 1B 11:18:37; Hr'g Tr. 73:574:18.) Officer

4

Wilson again said, "Yo! Hey!" and approached Buster. (Gov't Ex. 1B 11:18:38.) Buster then started to run away from the officers.

After running for a few seconds, Buster fell down. The officers apprehended him on the ground and handcuffed him. Buster told the officers that the bag strapped across his back was choking him, so Officer Tyree-Williams cut off the bag. The bag felt heavy and hard to the touch. She opened the bag and found a gun and box of ammunition inside.

Around 11:21 p.m., the officers asked the suspect whether his name was Anthony Buster. The officers also asked Buster additional questions regarding his flight and his possession of the gun. The officers then asked Buster if he had a concealed weapon permit and whether he was a convicted felon. Before searching Buster, Officer Wilson asked him if he had anything that would poke him during the search. Buster responded in the negative. During the pat-down search, Officer Wilson discovered another bag of ammunition in Buster's pocket. Another officer asked Buster whether he had anything else on his person. Buster responded that all he had was a pocketknife and the gun.

The officers then took Buster to the police station and put him in an interview room. Officer Wilson first interviewed Buster without giving him *Miranda* warnings. During the initial interview, Officer Wilson asked Buster about the gun and confirmed that Buster was a convicted felon. He also suggested to Buster that someone could test his hands for gunpowder residue. Officer Wilson further asked Buster whether he had shot a gun in the air that night and asked him about the altercation with Anderson. They also discussed Buster's reasons for carrying the gun and his status as a felon.

After questioning Buster in the interview room for approximately ten or eleven minutes, Officer Wilson realized that he had neglected to read Buster his *Miranda* rights. Officer Wilson

then left the interview room to get a *Miranda* statement card and returned to the interview room after about ten minutes had passed.  After Officer Wilson gave Buster his *Miranda* warnings, Buster agreed to continue to speak with Officer Wilson.  Officer Wilson then discussed with Buster "essentially" the same material discussed in the pre-*Miranda* interview and referred to the pre-*Miranda* discussion.  (Hr'g Tr. 82:14 to 83:10.)  Officer Wilson testified that he "asked [Buster] to just go over his story with [him] again."  (*Id.* at 83:7-10.)

Buster argues that the officers lacked reasonable suspicion to stop him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), rendering the gun and ammunition evidence inadmissible and his later statements fruit of the poisonous tree.  In the alternative, he argues that his post-*Miranda* statements were the product of an impermissible "two-step" tactic designed to undermine *Miranda*.

## II.  DISCUSSION

Buster asks the Court to suppress the following evidence: (1) the gun and ammunition that the officers found during the search at the scene; (2) Buster's statement to the officers at the scene admitting that he had a knife and a gun; and (3) Buster's post-*Miranda* statements made to Officer Wilson at the police station.[4]

### A.  The Gun and Ammunition

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. A police officer may "seize a person for a brief investigatory stop if he 'observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be

---

[4] The government agreed that it would not seek to introduce Buster's pre-*Miranda* statements at the police station or his statements at the scene regarding his status as a felon. Accordingly, Buster's motion to suppress is moot to the extent that he asks the Court to suppress those statements.

afoot.'" *United States v. Slocomb*, 804 F.3d 677, 681 (4th Cir. 2015) (quoting *Terry*, 392 U.S. at 30).

To justify a stop, the officer must "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The officer must have "reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia*, 448 U.S. 438, 440 (1980). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Slocomb*, 804 F.3d at 682 (quoting *United States v. Black*, 707 F.3d 531, 539 (4th Cir. 2013)).

Courts consider the totality of the circumstances when deciding whether an officer had reasonable suspicion to support a *Terry* stop. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "In reviewing police action, courts look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'" *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008)).

In this case, the government points to several factors that gave Officer Wilson reasonable suspicion to stop Buster: (1) Buster's resemblance to the person suspected of shooting a gun in the air during a domestic assault incident, (2) Buster's flight from the officers in a high-crime area; and (3) the proximity in time and place to the alleged domestic assault incident and subsequent search for the suspect.

## *1.  Resemblance to the Domestic Assault Suspect*

In general, a police officer may stop a person under *Terry* when that person sufficiently matches the description of an active suspect. *See United States v. Swann*, 149 F.3d 271, 273-74 (4th Cir. 1998); *see also United States v. Shelton*, No. 1:11CR397-1, 2012 WL 13075291, at *1-2 (M.D.N.C. Feb. 22, 2012).  At the same time, "the relevant facts articulated by the officer[ ] . . . must 'in their totality serve to eliminate a substantial portion of innocent travelers.'" *Bowman*, 884 F.3d at 213 (quoting *United States v. Williams*, 808 F.3d 200, 246 (4th Cir. 2015)).

In this case, Officer Wilson had reasonable, articulable suspicion that Buster was the suspect involved in a domestic assault incident potentially involving a gun.  When Officer Wilson first came across the suspect, he identified the suspect as an African American man who was wearing black pants and a black shirt with "a lot of . . . speckles or colors." (Hr'g Tr. 9:13 to 12:6.) After Holman told Officer Wilson that the suspect was wearing an all-black shirt, Officer Wilson saw a man near the basketball court area remove a black shirt to reveal a white tank top underneath. Officer Wilson also saw that the suspect was wearing blue jeans and had a black bag.  Shortly thereafter, Officer Tyree-Williams told Officer Wilson that the suspect was a dark-skinned man who had "hair" and was wearing an all-black shirt and "speckley" pants. (*Id.* at 106:20-23; Gov't Ex. 2A 10:56:13-10:56:24.)  When the officers eventually stopped Buster on Fairfield Avenue, they encountered an African American man who was wearing a white tank top, dark pants, a sheer head covering over braids, a blue bandana hanging around his neck, and a small black bag strapped across his chest.

Buster, therefore, sufficiently matched the description of the suspect in a reported domestic assault incident potentially involving a gun.  That the description changed slightly over the course of the evening does not defeat the reasonable suspicion determination. *Cf. Shelton*, 2012 WL

13075291, at *5-6 (holding that the officer had reasonable suspicion to stop the defendant when the defendant sufficiently matched the race, sex, and height of an armed robbery suspect).[5] Ultimately, Officer Wilson was looking for an African American man with a small bag who was wearing a white tank top and dark pants in the vicinity of Creighton Court.  When Officer Wilson came across Buster on Fairfield Avenue, he found an African American man with a small black bag who was wearing a white tank top and dark pants.  Because Buster sufficiently matched the description of the suspect, Officer Wilson had "a *particularized* and objective basis for suspecting [Buster] of criminal activity." *United States v. Massenburg*, 654 F.3d 40, 486 (4th Cir. 2012).

Buster argues that the description of the suspect—an African American man wearing a white tank top and dark pants—could apply to many men innocently walking in the Creighton Court area that night.  But Officer Wilson had come across Buster on two prior occasions that evening.  Indeed, Officer Wilson testified that he recognized Buster on Fairfield Avenue as having the same "body structure" as the suspect he saw earlier in the evening.  (Hr'g Tr. 20:9 to 21:3.) Standing alone, the similarities between the suspect's characteristics and those of Buster may not have given rise to reasonable suspicion.  But the "cumulative information available to" Officer Wilson did provide sufficient justification to stop Buster.  *Branch*, 537 F.3d at 337 (noting that "[a] set of factors, each of which [are] individually 'quite consistent with innocent travel,' [can]

---

[5] *See also, e.g., United States v. Pettiford*, 295 F. Supp. 2d 552, 558 (D. Md. 2003) ("Although the Court recognizes that there are limits to the authority of the police to stop individuals who simply match a basic description, the Court need not test those limits here.  The police in this case were investigating a serious crime and, therefore, were permitted to stop a man matching the available description whom they located in the immediate vicinity of the shooting shortly thereafter."); *Harbin v. City of Alexandria*, 712 F. Supp. 67, 71 (E.D. Va. 1989) ("The minor discrepancies between the suspect's reported characteristics and those of the plaintiff are far too slender a reed on which to base a constitutional violation.").

still, 'taken together' produce a 'reasonable suspicion of criminal activity" (quoting *Sokolow*, 490 U.S. at 9)).

### 2. *Evasive Behavior in a High-Crime Area*

Buster's evasive behavior in a high crime area further supports the reasonable suspicion determination. In *Wardlow*, the Supreme Court held that "unprovoked flight" upon seeing a police car in a high-crime area gives officers reasonable suspicion to justify a *Terry* stop. 528 U.S. at 124-25. Creighton Court is a high-crime area with frequent gun violence. (Hr'g Tr. 92:12-22.) While a person's presence in a high-crime area alone will not provide reasonable suspicion for *Terry* purposes, it is "among the relevant contextual considerations in a *Terry* analysis." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

Before the officers approached Buster on Fairfield Avenue, he had exhibited "nervous, evasive behavior" in response to police activity on two prior occasions that evening. *Id.* First, Officer Wilson testified that Buster "started speed walking away" upon seeing police officers walk toward Anderson's apartment in Creighton Court. (Hr'g Tr. 9:25 to 10:8.) Second, Buster ran away when Officer Wilson called out to him near the basketball court in Creighton Court. (*See* Gov't Ex. 1A 10:43:07-14; Hr'g Tr. 14:11-21.) Thus, even if Buster's behavior did not amount to unprovoked headlong flight, he still "acted to evade the police upon noticing [police presence] in a high-crime area." *United States v. Bumpers*, 705 F.3d 168, 175-76 (4th Cir. 2013).

Buster also argues that his behavior on Fairfield Avenue did not give rise to reasonable suspicion because his flight was not unprovoked. *Wardlow*, 528 U.S. at 124. When Officer Wilson first approached Buster on Fairfield Avenue and asked to speak with him, Buster declined by saying "Nah" and continued walking. (*See* Gov't Ex. 1B 11:18:37; Hr'g Tr. 73:5 to 74:18.) Only after Officer Wilson again called out to Buster did he begin to flee. (*See* Hr'g Tr. 11:25 to 12:6.)

Regardless of whether Buster's behavior on Fairfield Avenue amounted to *unprovoked* flight, he still exhibited "nervous, evasive behavior" in response to police activity on Fairfield Avenue and on two prior occasions that evening. *See Bumpers*, 705 F.3d at 175-76 ("'[E]vasive conduct, although stopping short of headlight flight[ ]' is still an important factor for a court to consider when making a reasonable suspicion determination." (quoting *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993))).

### 3. *Proximity in Time and Location to the Reported Domestic Assault*

Finally, Officer Wilson found Buster relatively close in time and place to the reported domestic assault incident and gun discharge. *See Swann*, 149 F.3d at 274 (holding that a police officer had reasonable suspicion to stop the defendant because the officer was "investigating a crime that had just occurred" and the officer "saw two suspects fitting the descriptions of those wanted for the crime"). While Officer Wilson encountered Buster on Fairfield Avenue almost forty minutes after initially responding to the assault, the officers stopped him within about eight minutes after they discontinued the perimeter search for the suspect. And Officer Wilson stopped Buster on Fairfield Avenue, which is close to Creighton Court.

*   *   *

In sum, the officers had reasonable suspicion that Buster was the suspect in a reported domestic assault incident potentially involving a gun. Following the stop, Officer Tyree-Williams felt that Buster's bag was heavy and hard to the touch. Because the officers had reason to believe they were dealing with an armed and dangerous person, the pat-down of Buster's person and the search of his bag were reasonable. *See Terry*, 392 U.S. at 27. Accordingly, the Court will deny the motion to suppress the gun and ammunition.

### B. Buster's Statements

#### 1. Statement Made at the Scene

Police officers must advise a suspect of his *Miranda* rights when the suspect is subject to a custodial interrogation. 384 U.S. at 478-79. "If the custodial statement is made in response to police inquiries made to preserve their own safety or that of the public, however, the statement is admissible." *United States v. Lloyd*, 581 F. App'x 203, 204 (4th Cir. 2014) (per curiam) (citing *New York v. Quarles*, 467 U.S. 649, 659 (1984)). The officer's question must relate "to an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Quarles*, 467 U.S. at 659 n.8.

In this case, Buster's statement that he had a pocketknife and a gun falls within the public safety exception to *Miranda*. As Officer Wilson performed a pat-down search of Buster, he asked Buster, "Is there anything here that is going to poke me." (Hr'g Tr. 24:23-35.) At that point, the officers had found a gun, pocketknife, and ammunition on Buster's person. Buster said that all he had was a pocketknife and the gun. Officer Wilson, therefore, asked Buster the question to "protect [his] own safety or the safety of the public" from the immediate danger of a weapon. *Quarles*, 467 U.S. at 653. Moreover, Officer Wilson thought that Buster was the suspect from the reported domestic assault incident and gun discharge. The Court, therefore, will deny the motion to suppress Buster's statement on the scene that he had a pocketknife and a gun.

#### 2. Statements Made at the Police Station

In the alternative, Buster asks the Court to suppress the statements he made to Officer Wilson during the second interview at the police station. Because Officer Wilson failed to give *Miranda* warnings during the first interview, Buster says that Officer Wilson's midstream *Miranda* warnings failed to cure the taint of the first interview. The so-called "two step police protocol"

involves "intentionally withholding *Miranda* warnings from a suspect, questioning the suspect until securing a confession; then obtaining a waiver of *Miranda* rights from the suspect and covering the same material using leading questions." *United States v. Mashburn*, 406 F.3d 303, 307 (4th Cir. 2005).

In *Missouri v. Seibert*, five Justices concluded that the "midstream recitation of warnings . . . could not effectively comply with *Miranda*'s constitutional requirement." 542 U.S. 600, 604 (2004). A plurality of four Justices set forth the following factors courts should use to determine when midstream *Miranda* warnings pass muster:

> the completeness and detail of the questions and answers in the first round of questioning, the two statements' overlapping content, the timing and setting of the first and second rounds, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* at 615. Justice Kennedy agreed that the defendant's statements were inadmissible but rejected the plurality's multi-factor test. *Id.* at 622 (Kennedy, J., concurring in the judgment). In Justice Kennedy's view, courts should apply a "narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.*

Without a controlling opinion in *Seibert*, lower courts were required to determine which test to apply when confronting midstream *Miranda* warnings. In *Mashburn*, the Fourth Circuit adopted Justice Kennedy's opinion as *Seibert*'s holding, reasoning that "Justice Kennedy concurred in the judgment of the Court on the narrowest grounds." 406 F.3d at 308.[6] Accordingly,

---

[6] "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

absent evidence of "the deliberate 'question-first' strategy," *id.* at 309, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made," *Oregon v. Elstad*, 470 U.S. 298, 307 (1985). The Court, therefore, must determine whether Officer Wilson's "failure to convey *Miranda* warnings to [Buster] was deliberate or intentional." *Mashburn*, 406 F.3d at 309; *see United States v. Jones*, No. 3:19cr122, 2020 WL 255886 (E.D. Va. Jan. 17, 2020) (applying Justice Kennedy's opinion).

In this case, the evidence supports a finding that Buster's post-*Miranda* statements are the product of an impermissible two-step interview tactic. Officer Wilson's pre-*Miranda* questioning of Buster in the interview room lasted ten or eleven minutes. During that time, Officer Wilson and Buster discussed Buster's possession of the gun, his status as a convicted felon, whether he shot a gun into the air that night, and the altercation with Anderson. Officer Wilson then stopped and left the interview room for about ten minutes. After reading Buster his *Miranda* rights, Officer Wilson asked Buster to go back over his story a second time and discussed much of the same information as in the pre-*Miranda* interview.

Moreover, Officer Wilson did use any "curative measures" to ensure that Buster understood "the import and effect of the *Miranda* warning" and his decision to continue the interview. *Mashburn*, 406 F.3d at 309. Given the closeness in time and circumstances between the two interviews, the significant overlap in discussion topics, and the apparent lack of any statement by Officer Wilson regarding the inadmissibility of Buster's pre-*Miranda* statements, the Court concludes that Officer Wilson's two-step questioning tactic did not comport with *Miranda*. Accordingly, the Court will grant the motion to suppress Buster's post-*Miranda* statements.

## III. **CONCLUSION**

For the foregoing reasons, the Court will grant in part and deny in part Buster's motion to suppress.  The Court will suppress Buster's post-*Miranda* statements made at the police station. The Court will deny the motion in all other respects.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: ___3 August___ 2020
Richmond, VA

_____/s/_____
John A. Gibney, Jr.
United States District Judge